May it please the court, I'm Sean Andrew Sear. The court appointed me to represent the appellants Lila and Christopher Covey. Their case lies near the core of the Fourth Amendment. Government agents intruded into the curtilage of the Covey's secluded rural home without a warrant, exigency, or consent. Based on that conduct, the Coveys have stated a valid claim under the Fourth Amendment. Well let me ask you this, did you ever plead in your complaint or your briefs that you were seeking only nominal damages or more than that? Well the complaint lists the damages. What damages would be available have not been briefed, but nominal damages would be a form of relief. And secondly, the injury that you claimed, does it result from the criminal proceeding rather than only the Fourth Amendment violation? Mr. Covey cannot recover damages from the criminal proceeding. So you're not asking for that? No. Any damages as a result? He cannot recover damages for the criminal proceeding. No, this would be that the scope of damages hasn't been briefed, but at the very least nominal damages would be sought for the Fourth Amendment violation. If he were to receive any damages, wouldn't it undermine his criminal conviction? No, Your Honor. A determination on this issue, on this claim, which is the search claim, would not imply, demonstrate, much less necessarily so, the invalidity of his conviction, because it would simply be a determination about what happened on that day and whether there was a violation of the Fourth Amendment on that day. So we have cited Haring v. Procise, in which the Supreme 1983 action, that success on that claim is irrelevant to the validity of a conviction secured by a counsel guilty plea, and that is the test under Heck. The test under Heck is whether the success on that claim would demonstrate, necessarily imply, the invalidity of the conviction, and if it will not necessarily demonstrate the invalidity of the conviction, then the claim proceeds. And the Supreme Court has, at least twice since Heck, and I'm aware of Nelson and Skinner, said that we were careful in Heck to emphasize the word necessarily. So my answer to that question, as we brief this issue, is no, that this is a distinct claim. I'd like to begin with the officers and, in particular, the factual determination made by the District Court on that claim, before I talk about the the knock-and-talk exception. The District Court resolved the claim by finding, on a pro se complaint at the Rule 12b6 stage, that the officers necessarily saw Mr. Cubby at his workbench outside before they entered the yard. And we have contested that finding, and if we back up in the record, this is where the court relied on Alvarez. I'll note, and my I went back over the briefs in the District Court. I didn't see any of them citing Alvarez. The magistrate judge, in the magistrate's report, made a determination that it was clear that he was outside, clear to the officers. To that, the Cubby's objected. They objected and said that, based on the property and the layout of the residence, that the officers could not have seen him at the workbench until after they had breached the curtilage and were in the private backyard area. The District Court said, this court disagrees, at the 12b6 stage. And the court invoked the criminal complaint submitted by Officer Espejo the criminal complaint does not speak to this issue of whether the officers saw Mr. Cubby before they entered the yard. It's ambiguous on that question. It just doesn't address that question. And the photographs . . . Did we be considering the criminal complaint at all, at this stage? Should the District Court have considered it at all? The Cubby's filed the District Court complaint. And so, as often happens in a pro se case, the District Court will consider documents filed in opposition, including briefs, filed in opposition to a motion to dismiss in construing the pro se pleadings. Our point is that that document on its face doesn't answer this because from the area where the officers parked, which was on grass, partially partially on gravel, there is a wall that screens the door, the basement door off the patio. Mr. Manchester says in his brief, well, but the back of the patio would have been visible, which we conceded, we said in our opening brief, but that's irrelevant if that's not where the workbench was. And in fact, the officers saw him, he was by the door, and the Cubby said below, in objecting to the magistrate judge's report, that the workbench was just to the left of that door. In other words, it was in a corner. And you're talking about the patio, the basement door? The basement door out by the patio. And so, if a workbench is to the left of the door against the wall of the home, and then there's this perpendicular stone wall, so he's in that right-angle area, and the officers are parked partially on the grass off the gravel up here. Here in the record, is there any indication where the officers were parked? The photographs, the Cubby's annotated the photographs they submitted, Your Honor, and so it would be JA 51, I believe, where they say this is where the officers parked on the grass. So it's the Cubby's annotation of those photographs? Yes. That's the only indication? Right, that's the supplemental information. The complaint says, Your Honor, in perhaps, I'd have to get the particular paragraph, but it says they parked off the driveway. That's all right. I got it. On the grass. So we have a decision by the district judge under Rule 12b6 that turns on a factual finding on the basis of this Alvarez case that none of the defendants even brought to the district court's attention. Beyond that, the scope of this knock and talk exception, we take . . . our position is that they are expanding this beyond its logical breaking point. This is a limited license that allows what's called a licensed intrusion, what the Supreme Court has called an invitation or license that exists by custom. It's implied. It's the license the Supreme Court said more than 60 years ago extends to solicitors, hawkers, and peddlers to approach a front door, and it's what this court in Taylor said allows a person to approach the front door of a castle, and the court referred to a pollster, a salesman, or an officer of the law. In other words, this is the license, a limited license that allows visitors to approach a customary entranceway or a place where a visitor could reasonably expect to be received, which in almost every case is going to be the front door. This is grounded on implied consent, the notion being that the homeowner, unless the homeowner takes extraordinary steps to seal the curtilage, will be received at that door for a consensual encounter, which the homeowner can reject. The homeowner cannot answer the door, can speak from behind the door, can open the door, and kindly ask that visitor, that pollster, that salesman, or that officer to leave, and they must leave. And the irony here is that the knock and talk exception is being invoked by If we just take that as true for the sake of what I'm about to say, but never sought to get consent, never motioned to the man, but cornered him against the back of his home in the curtilage in the patio area. Mr. Manchez, I think, says in the brief, well, that he didn't see us doesn't mean we didn't see him. This is supposed to be a consensual encounter, not a sneak attack by officers in the curtilage of a home who have reason to suspect that there might be pot in that area. So this is taking this very limited license, and in our submission, expanding it to what would be, in effect, a special law enforcement right for investigation in the curtilage as a matter of expediency and convenience. And I want to be clear about this. We are not arguing that there's an inflexible rule requiring visitors to every single case, because there may be cases in which the back of a home or some other area is, under the circumstances, a customary entrance way, a place where visitors could expect to be received. But this is not that case. This is a case in which the photos indicate there's no entrance behind the And what the officers are relying on is a basement door, a glass door, under a deck, around a screening wall, with no walkway there. So under these circumstances, when you look at knock-and-talk cases, these are cases decided on developed records where we have circumstances that would allow a reasonable person to conclude that they're approaching a customary entrance way or a place otherwise where a visitor could be expected to be received. We turn to the tax assessor for the moment. And again, go to the district court's factual finding here. The district court said that the tax assessor didn't do anything beyond executing the normal responsibilities of his employment as a tax assessor, and that the Coveys have no reasonable expectation of privacy with regard to items viewable by the naked eye from the curtilage of their home when a property tax assessor is executing the responsibilities of his employment. Let me put aside our argument about the propriety of a government tax agent intruding without homeowner knowledge or consent into the curtilage of a home to gather information for the government to assess taxes. Let's put that aside for the moment and just put him in the yard to assess property, like the tax assessor in the Widgren case from the Sixth Circuit. The district court's determination that the tax assessor didn't do anything but execute normal responsibilities and see matters that were plainly viewable to the naked eye is not supported by this record. The record does not establish that the marijuana was plainly viewable to the naked eye. The Coveys have maintained it wasn't. And if we go back and look at this in the record, the tax assessor never even advanced a Fourth Amendment merits argument in his motion to dismiss. In opposition to the other motions to dismiss, the Coveys said that the marijuana was not in plain view when the tax assessor was there. This isn't something that I'm bringing into the case after the fact. This is what the Coveys maintain in opposition to the motions to dismiss. They said it was not in plain view and that, in fact, they alluded to personal effects and said that it wasn't in plain view and the assessor would have had to search a closed container. The magistrate judge's report, nonetheless, said that marijuana was growing openly in the patio area. To that, the Coveys objected and said, again, no. The only marijuana that was in that area when the assessor was there was in a non-transparent closed container. But the criminal complaint that the Coveys themselves submitted says that the officers could see what appeared to be marijuana on the workbench. Exactly, Your Honor, and that's, I think, where the confusion arises. The scene that the officers saw when they arrived later was not the scene that the assessor saw when the assessor was there earlier. And that's what the Coveys have been maintaining. When they left the home, which is when the assessor came without notice, knowledge, or consent, the marijuana was not out in the open. It was in a bin, in containers in the bin, in closed containers. And they have said this in opposition to the motions to dismiss about the closed container, and they said it in objecting to the magistrate judge's report. I want to go back to my initial question, because I'm having a little hard time with that in the case that I sat on with Bishop. Is the suit to recover nominal damages for the entry to the courthouse, or do you intend for the suit to go further than that? Namely, are you going to be challenging the seizure, which you have waived by pleading guilty? I'm trying to figure out what is it you? Mr. Covey could get nominal damages. He cannot recover damages for having been convicted of the crime he acknowledges he is guilty of and is not challenging that conviction. He is not contending he's innocent. He cannot get damages for that, Your Honor. So it is that you're contending the Fourth Amendment violation was the entry into the curtilage? Yes. Yes, Your Honor. And it's disconnected from his plea. And so if he is limited to nominal damages, then he is limited to nominal damages. He cannot recover damages for having been convicted. And so getting back to the tax assessor, if I can. You can, but it's at the cost of your three minutes you've left for rebuttal. Your Honor, I'll save the rest for rebuttal. Thank you. Mr. Butt. Thank you, Your Honor. Your Honor, my name is Thomas Buck, and I represent the Ohio County assessor and her employees and the Ohio County sheriff and his employees in this matter. On behalf of my clients, I urge you to affirm the decision of the court below because there plainly was no Fourth Amendment violation by any of my clients in this matter. What I'd like to start with, and first, if I could respond to the questions you had earlier, Plaintiff is actually seeking anywhere between $5 million and $8 million, depending on how you read his complaint. And he has specific counts, not only for the Fourth Amendment, but also for false imprisonment, false arrest, and other things like that. And those are all set forth in his complaint. And I just want to respond to your earlier question. Now, I'll start with the assessor. In the present case, the assessor didn't conduct a search. And before the plaintiff can bring a Fourth Amendment claim against my client, they've got to show and allege that a search occurred and that that search was inappropriate. We don't have a search here. There is no question of fact that's been raised and no pleading that anything happened other than the assessor going to do the assessor's job. This case is very similar to the Wild Green case and amazingly similar to the Taylor versus the Department of Natural Resources case. And the general idea is people do not have a reasonable expectation of privacy, even in their cartilage, when it comes to a postal worker coming to deliver mail or a package or a meter reader coming to do a job or, in the Taylor case, a DNR officer coming and looking at the property. In the Taylor case, the DNR officer went through a locked fence, travelled up a private drive, walked all the way around the property, even peered in the windows. Plaintiff said this is a Fourth Amendment violation. Court looked at it and said, no. The DNR officer there wasn't there for a search. He was checking the property, doing what a DNR is supposed to do. We don't have a problem here. And they looked at other little factors, like the time of the day. Was it at night when something nefarious could happen? No, it was during the day. The DNR officer left a calling card saying, hey, I was here doing my job. If we look at those factors in our case, in Plaintiff's Complaint, paragraph 7, plaintiff alleges 12 o'clock, my assessor was there. It's not in dispute. Middle of the day, business hours when you'd expect somebody to come do that kind of job. My assessor walked around the property. Assessors are allowed to figure the outside dimensions of the real estate for calculating value. They're allowed to walk around all aspects of the property. No search. What impact is your internal regulation that when you see no trespassing signs, you're to back off? Well, that comes down to a separate issue. Did the assessor violate an internal policy? Maybe. That internal policy can't create a Fourth Amendment claim. Violating an internal policy on how you do the assessment doesn't change the assessment to an illegal search. That's what plaintiff would need to show. And nothing in 189 CSR 2 converts anything the assessor did or didn't do into a search. And if it's not a search, we don't have a Fourth Amendment claim. Why did he open the door to their home? Well, we don't concede he did, but for purposes of today's argument... You have to do, you have to concede that, for the argument's sake. What plaintiff alleges in their complaint is the assessor took the business card and assessment documents and set them inside the door. In West Virginia, a lot of people don't lock their doors. We don't have a real problem with crime in some areas. So, assuming that's what happened, the assessor set the paperwork there inside the door and went about his business. Again, not a search. Now, did he violate a policy, maybe, by opening that door? Possibly, but that would be a state law issue. What about going into closed containers to find marijuana? Well, that's interesting, because that's not alleged in a plaintiff's complaint. In fact, that's not even alleged in any of the pleadings. The bin, rummaging around the bins, wasn't mentioned by the plaintiffs at all in the complaint. You can look at Joint Appendix No. 11, it's not in there. It wasn't in two of plaintiffs' briefs, and that would be DACA 35 and DACA 41. It wasn't in there. It wasn't in the rebuttal brief in DACA 48. In fact, it surfaces later on as a new change in the facts. And plaintiffs have changed a lot of the facts to try to create a question of fact here when there isn't one. For example, plaintiffs have tried to argue that the officer's parked in the grass, but if you look at Paragraph No. 11 of plaintiff's complaint, they say the officer's pulled up in the driveway. So they changed the car from the driveway to the grass. We changed open view to in hidden containers and rummaging around. There's no factual basis to support this rummaging around argument, and that's something they added after the fact when they wanted to try to get around the court's decision in the case. And I submit that you can't take into consideration new facts that the appellants add just because they're trying to get around the court's decision. The state court issues the procedural rules you mentioned. Not only do they not create a constitutional law standard, they don't create a civil cause of action of themselves. So plaintiff is trying to take an administrative provision and turn it into a constitutional law claim so he can state a claim that he doesn't have otherwise. And we submit that that is inappropriate, and there's no precedence to support that. Further, the court below was very precise in how it decided this case. Didn't sweep with a broad brush. All they did is just cut out the state law claims and dismiss them without prejudice. Plaintiff is free to pursue the state law claims. They can go ahead, if there's any claim under 189 CSR 2, they're free to do that in the state court. They don't have to entangle it with the federal court. We don't have to have the federal court interpreting these internal procedures created by the state. The state court can do that. So that issue really isn't even before us now. Finally, even if there were some issues there, the Supreme Court has clearly held in the Davis versus Scherer case that somebody in my assessor's position does not lose their qualified immunity simply because they may have violated an internal procedure or regulation. And they addressed that issue very clearly. You can't use this internal procedure to take away qualified immunity. The only facts in this case are the assessor was there to do an assessment. Whether you violated internal procedures or not is a state law issue. There was no search. We have no Fourth Amendment violation. If we even try to call it a search, we have qualified immunity because we're allowed to be there. We're allowed to look around that property. We're allowed to be in the curtilage. So based on that, we argue that the dismissal of the assessor was appropriate, and we ask that you guys affirm that decision. Moving on to my officers. We submit that there was no internal violation, or no constitutional violation there either. Here, no question of fact, this is a rural house in states of construction. The officers pull up to this house, and there are two entrances. They're left with a decision, a quick decision, which door to choose. Are you saying there's some exigency here? No. Well, you said a quick decision. Well, you pull up, you look at the house, you make a decision which door you go to. Not a quick decision, though. Well, it doesn't have to be real quick, but you walk up and look at it. What about a house that they have a front door? I mean, go figure. Not really. With a walkway. A front door with a walkway. Well, in the present case, the idea of a front door, while that works in a lot of environments, doesn't always work in West Virginia, because this is not suburbia. There's no street. There's no sidewalk. There's no picket fence, and there's no numbers over the door telling you what's a front door. There's no trespass signs. There are. There's no question. But there's plenty of cases. There's a gate and a sidewalk to a front door with an awning over it, right next to the driveway, in the photograph. There is. There's a door on one side of the building. There's a door on the other side of the building. So where did they go? What they did is they chose the door where they saw the homeowner. They chose a large double door, glass French door, opening onto a porch. It was on ground level. There was no fence. They never knocked on the front door? They did not knock on the front door. Okay, so in the district court's opinion at page two, where it says, upon arrival at the home, the officers knocked on the front door, and receiving no answer, proceeded to walk to the back of the home, where they found Mr. Covey and observed marijuana, and the scent of marijuana. Where does that come from? It's in the district court's opinion at page two, and again at page nine. Yeah, the district court clarifies it later, and says they went straight to the back door. I believe that may, I don't know where that came from. That may have been. It's been there twice. Yeah, I think it was an amalgamation, maybe of the assessor going to the front door and knocking, and then the officer's going directly to where they saw the felon. Where does the district court clarify it? Where did, actually not the district court, where in your briefs is that clarified? I don't know if I clarified it in the brief at all, but it is cleared in the record later, and I don't remember the page offhand. Perhaps one of my colleagues will later, when they get up, they might be able to address that a little more precisely. So all the, I mean, you indicated a minute ago that the plaintiffs continue to change the facts. It appears all parties are changing the facts here under this. That's not changing the facts. I believe it's possible the original factual history by the court may have had an error in it. The defendants are not changing any of the facts. The simple facts are the officers pulled up, saw him, walked over. And courts have shown and argued the officers don't have to engage in some fancy algorithm or have some type of crystal ball to figure out which door is the main entrance. This door was, I mean, the house was under construction. As I said earlier, this door's a double door. They had talked to the tax assessor, correct? The tax assessor called the sheriff. And he went to the front door. The tax assessor contacted Sheriff Butler and informed him of seeing marijuana on the back porch area. So they went straight to the back porch area. The assessor went to the front door. But the officers, since the assessor had told them the marijuana was on the back porch, they went straight to the back porch area. There's absolutely nothing in the record that says where the marijuana was or whether the assessor told anybody where it was. There's nothing in the record that supports that. Just that he saw it on the premises. They drove up. They didn't ask him where. To my knowledge, I have no knowledge of them asking where. The uncontroversial facts are they pull up the driveway, have a clear sight of that entrance to the house that plaintiffs want to call the rear entrance, and they see the gentleman there and they walk over to talk to him. Exactly what anybody would do. The Girl Scout cookie salesman would do it. Anybody coming up to that place sees the person there is going to go talk to them. There's no violation there at all. There's some question, factually, whether or not they saw him in the rear before they approached the rear curtilage. Isn't that a factual question? Which came first, over chicken or egg? No, in plaintiff's complaint, plaintiff specifically says he was out there and the officers say, we pulled up, he was out there. Now, plaintiffs want to pretend the cops didn't see him and try to create a question of fact, but no, it was specifically alleged he was outside, the officers pulled up, and upon arrival, saw him, very consistent with the facts there. So there's no real issue there, fact-wise. Finally, even if there were some dispute or some argument of whether things were seen or whatever, qualified immunity clearly covers here. Alvarez says you can go around to the back door. The Kennedy case says you can. Bradshaw says if you smell moonshine, you can go around the back door. Here, there's no factual dispute that the officers smelled marijuana. It's clearly in the record, page 33, if I remember correctly. So if you can go check out. Where were they when they smelled the marijuana? Where were they? Where were they? Pulled up the driveway, got out of the vehicle, smelled it immediately upon arrival. As soon as they alighted the car, they smelled marijuana? Yes. Do we know how far away that was? Walked right over to the main door where the plaintiff was working, chopping it up. I'll tell them, you know, linear, feet. Didn't measure it. I think plaintiff argues it's 60 feet. Smelled marijuana, not burning, 60 feet away. I have no experience with marijuana, but I've been told that it's very pungent and you can smell it very clearly when you know what you're doing. And their ability to smell the marijuana is not in dispute in this case. Just like in the Bradshaw case, the court specifically noted there was no dispute as to the officer's ability to smell moonshine. So that issue's not in dispute. But is this, I'll ask the counsel, is this really a knock and talk case or this really is, before they got there, they knew there was contraband there. They knew, as backer's question I think suggests, they knew it was behind the house in the rear door. Knock and talk is the exception was for, you go where people go normally. Police officer can knock on the door and say, ma'am, sir, did you see this go on here? And in the context of that, like any public person could do, you see something with a clear view. But here, this wasn't the case. They knew exactly where they were going. And they knew what they were looking for and they knew where it was, right? And that, I mean, at least the facts of the case based on what the assessor told them. I'm out of time, but I'll answer your question if I may. I appreciate it, go ahead. All the record shows is the assessor contacted Sheriff Butler. Told Sheriff Butler he believes he saw what may have been marijuana at the home. Based on that tip, the record says Sheriff Butler passed that information to the High Valley Drug Task Force, which dispatched two officers to go talk. They went and did a knock and talk. They had no evidence that it was there. There's nothing in the record saying where it was. They simply went to talk to the individual. The assessor could have been wrong. Maybe they were buckeye leaves. It's a plant that kind of looks like marijuana. It could have been that. All they had was a tip, credible tip. Went and went to talk to the person. It was in plain view. And there's no allegation of any great conspiracy or cooperation between the departments. None of that's here. Thank you. Mr. Himmelfarb. May it please the court. Edward Himmelfarb with the Department of Justice for former DEA agent Robert Manchus. I'd like to respond quickly to the question about knock and talk and you already have a suspicion. This court in the Edens against Kennedy case said you can have a suspicion, still do a valid knock and talk, even if you suspect before you go there that there's criminal activity taking place. And maybe more important than that, the Supreme Court recently in Kentucky. When you had the front door. That case involved both the front and rear doors, as I recall, Your Honor. The front door first? Not necessarily because in this case, as the photographs that the Coveys submitted demonstrate, the officers arrived and they could see Mr. Covey standing outside the back. And I would suggest that the court look at page 50 of the joint appendix at the top photo. If you look at, we start with that. With a lot of houses, if you go in the driveway, you're facing the front of the house. With this, as you can see from here, if you go to the end of the driveway, you're in a 90 degree angle with the front of the house. What that means is when you come in the driveway, you're facing the side of the house, which by the way, was the side of the house and Mr. Covey was standing outside at the other door. So this photograph demonstrates as the officers came in the driveway, they could see him standing out there. And in addition, as we discussed in our brief, the photographs on the next couple of pages confirm that you can see at least part of the patio from where they parked. And we're assuming that's where they parked, by the way. The photographs, according to the plaintiff's brief, the photographs were taken after the lawsuit was begun. For present purposes, we assume that that's an accurate representation of where they parked. In our view, this case really starts and ends with the Alvarez decision because under Alvarez, reasonable officers could believe that that decision allows them to talk to the homeowner if the homeowner is visible in the back or the side yard here. You don't have to go to the front door if he's visible out in the yard. For example, if you go up to knock at the front door and there's a porch and the homeowner's sitting on a chair on the porch, you don't have to knock on the door first before you turn and you talk to the person who's sitting outside. If there's a person standing in the front yard with a rake, you don't have to go up to the front door and knock, not get in, just come out and talk to that person either because he's visible right there. And the same thing applies to this side door. If he's standing outside, as the complaint alleges, the officers who see him do not have to go to the front door first in a futile effort to find him inside when they already know he's outside. So these photographs, I think, are really demonstrative of this point. In addition, the criminal complaint that the Coveys also put in the record below says that upon arrival, officers observed a white male standing under the deck near the rear basement walkout door. That's on page 33. The male appeared to be working at the workbench as officers approached the male. He began walking toward officers. At that point, they could see and smell the marijuana. The idea was that they went to talk to him about this tip. What do you know about this? Somebody said there's marijuana here. What do you know about that? Well, that was kind of short-circuited because when they got there and they saw him and they went to talk to him, it became really obvious that there was marijuana there. They could see it and they could smell it. At that point, you don't really, there's no further point in asking any questions. They detained him and the rest of the case unfolded and he eventually pleaded guilty. So, that's basically- So, as you said, the plaintiffs are stuck with their pleadings. That's right. There is this concept of pleading yourself out of court and we suggest that this is really a case of that by putting in these photographs. They put enough facts forward, you're saying, that would establish Alvarez and that there was visible site connection. Yes, what they put in the record below does establish sufficiently for purposes of Alvarez, yes. And that's, in a nutshell, that's our position and if the court has further questions, I'd be happy to try to answer them. Otherwise, I'll defer to my co-counsel. Thank you very much. All right. All right, Ms. Hall. Yes, Your Honors, may it please the court and for purposes of clarifying the answers to your earlier questions, the appellee's brief at page three contains the correct version of the facts and it correctly states that the officers arrived and that they did not go to the front door. Instead, they saw Mr. Covey at the main door on the side and they approached him there. And even though the district court's opinion does contain some incorrect facts at the beginning, at page 74 of the joint appendix, the district court correctly assesses the facts and bases its decision on that correct assessment. On page 74, the court states, in this case, in the criminal complaint as well as in the plaintiff's complaint filed in this court, it is clear that when the officers arrived at the plaintiff's home in order to conduct a knock and talk, Mr. Covey was present on the property and was on the back patio at a workbench. Realizing that Mr. Covey was not inside the house, the officers proceeded to the backyard. We don't need the finding by the district judge that this is a knock and talk case, do we? Based on the fact that you've been, that has been argued here. We believe that, first of all, we believe that it was a knock and talk case. We believe that even though appellant suggests that some special exception, some special law enforcement exception needs to exist, in order to approach someone when you see them in the yard, we believe that it's the opposite. We believe that Girl Scouts, you know, all manner of people are permitted to approach someone in their yard when they see them. And that the natural thing to do is to go directly to that person rather than to go see them on the side of the house and walk to another door, knock on the door, knowing that they're not there. And in fact, I think that could, you could argue that that is, you know, is the wrong decision. And that begs the point that when the officers are faced with the decision of two doors, two possibilities of where to go, and a person at one of them, no person at the other one, and they are making that decision, they are using their discretion. And the concept of qualified immunity shields them from making an incorrect decision and protects them from liability in that situation. Here we believe that, number one, the law enforcement officers saw Mr. Covey at the home, they went to the appropriate door, they talked to him directly, they didn't search it, they didn't go and look in, you know, out into his yard, they went directly to him and spoke to him. Number two, we are not aware of any United States Supreme Court law or any Fourth Circuit law that requires the officers to go only to one door or to knock at that door before they proceed to another door. And in fact, in Bradshaw and in Alvarez, the court declined to exercise and implement that kind of bright line inflexible rule. Instead, the court indicated that reasonableness is the touchstone. Here we believe that the reasonable decision was the decision to approach the Coveys directly or Mr. Covey directly. And finally, when the court, and finally, as they pointed out in Edens, and Edens was not a case where they went to the front door or the back door. In fact, they went back to a shed, even in the face of no trespassing signs and in the face of a gated locked fence around the perimeter of the house. The court said even there, if there was a Fourth Amendment violation, the officers were still entitled to qualified immunity. Why? They were entitled to qualified immunity because at that point, and I think that was in 1998, there was certainly no law precluding what they had done. And at this point in 2009, there's certainly no West Virginia's court, no United States Supreme Court, no Fourth Circuit law that requires the officers to choose a particular door or requires them to make the right choice and second guess exactly what the homeowner thought the appropriate door was. I have nothing further unless the court has questions. Just one thing. You would agree if we do have to make a factual determination, we don't have jurisdiction to decide this case on qualified immunity. You agree with that? I'm sorry, Your Honor? You agree that if we have to make a factual determination, if there's a factual question still existing, then we don't have jurisdiction. Under our precedent at Fourth Circuit, we call it a jurisdictional matter. We don't resolve, can't resolve factual matter, correct? That's a limiting as to our interlocutory jurisdiction in these qualified immunity cases, correct? I do, Your Honor, but I do not believe that you have to make a factual determination. So you think it's absolutely clear. Is that because of the complaint of the plaintiffs themselves as to where he was when they were deprived? That's because of the complaint and the materials that the plaintiff tendered with the complaint that are not in dispute. I mean, the complaint states that the Coveys were outside. He was outside at his workbench, and that's at the record, page 13, paragraph 13. He doesn't dispute that. And the record, page 33, states upon arrival, the officer saw Mr. Covey working at his workbench. So there is no place in the complaint and no place in the record where Mr. Covey says. But based on the photograph, it seems like there would be a question of fact as to how they could have seen Mr. Covey working at his workbench if they parked in the driveway. The driveway is, as they have tendered it, the photograph, there really is not a driveway. There is a gravel or a dirt path that leads up and appears to lead directly to the side where the workbench is visible. So we would maintain that, no, it's uncontroverted that the officer stated in the complaint at page 33 that they saw the Coveys, and that has not been contested. The fact that the Coveys did not see the officers does not mean that the officers did not see the Coveys. All right, thank you. Thank you very much, Your Honor. Thank you, Ms. Hall. Mr. Andrews here. I'd like to pick up where that discussion just left off. The criminal complaint says upon arrival, the officers saw a white male under a deck. Upon arrival, as we've said, doesn't mean necessarily immediately upon entering the driveway. It means, it could mean soon thereafter, as we've demonstrated in the reply. It doesn't mean soon thereafter, because it says upon. You'd be reading something into the word upon. Well, if I say- Upon arrival, I saw someone. How do you read into that, or soon thereafter? We can't read those words to that. That's pretty clear. Upon arrival, I saw, you know, Bill. It doesn't say upon, shortly thereafter arrival, I saw Bill. That's different. That's a different sentence, isn't it? I mean, we can't change the English language. Well, Your Honor, in our reply brief, we pointed out, just as one example, the Supreme Court's Hamdan decision, where they say upon arrival, the German saboteurs in the Kieran case were taken into custody by the FBI. The German saboteurs weren't taken into custody upon the arrival of their submarines on the beaches in New York and Florida. It was sometime thereafter. If I say tomorrow to students that upon arrival in Richmond, I had dinner at such and such restaurant, that's true, but I had dinner about an hour after and after I checked in the hotel. If I say upon arrival at the courthouse, I argued this case, it's true, but it doesn't mean immediately upon walking through the doors before going to the metal detectors. That phrase, as we've demonstrated in the reply brief, as a matter of meaning, is not 100% clear, and then you have the photographs. Then you have the photographs. Photographs don't purport to say this is exactly where the car was parked. It's just a photograph. They annotated it, but I mean, the problem is, they prosaic, they put all this stuff in their own case, and they made all these things to be weighed by the judge and looked at it, but what does it say? This depicts exactly where the car was upon arrival, upon stopping, upon, where is that? That's a picture that accurately depicts the home, but where is that in the record that that is annotated to say this is our estimate? Because first of all, they wouldn't know, because if you can't be seen, then you can't see, so he wouldn't have been in a position to see where he stopped initially, so the picture can't purport to do that anyway, could it? Well, what the picture says is that on day 50 at the bottom, the officers park on grass with view of rear yard, 75 feet to patio door, and so, correct, at this stage, we don't have a record. We're on a prosaic complaint, and we don't know anything about what the officers saw or what they would claim their vantage point was. I've heard Mr. Buck say somehow that the officers, and I've never seen this stated before. I can be corrected on this, that they might have smelled marijuana from 75 feet away. That's what they said. Well. Something that says that's disputed? Well, what they said again is when they saw him, and this is the question that I'm raising, when they saw him, they observed marijuana and smelled marijuana. Again, where are they to observe marijuana on a workbench if they're not already in the yard by the bench to observe and smell marijuana if they are already breaching the curtilage going back there? Well, the problem is they're not breaching it for according to what they say is they saw him back there. They're moving toward him. I mean, that's in the process of seeing someone, well, it's kind of superfluous or ridiculous to knock on a front door when I see the inhabitant in the back. I mean, that's what the facts that your client put in the cell. Upon arrival, there was a complaint said, they put it in there, and you can't use your own type statements and contradict what you said before. I mean, that's what they put in. And they said that, yes, we saw him, and we moved toward it as we saw him and then saw marijuana. We smelled it, too. I mean, why is that inconsistent with defendant's version of what seems to be kind of undisputed? They did put the criminal complaint in there, and it's our contention that that criminal complaint at this stage does not conclusively establish when they saw him, where they were when they first saw him, whether they were already in the yard when they saw him. And there's nothing more- What it does is it establishes, for purposes of a knock and talk, that it's established that they saw him upon arrival. Now, you're right. You could say five seconds, but that's the facts of the case that they put in. Upon arrival, they saw him, and we know it was sometime before they didn't go to the front door. They said they saw him, and there's nothing that your client can really dispute of that, right? Because your client didn't see it by their own version. They couldn't say, oh yeah, I saw him because I peeped around the corner and saw exactly where he stopped, because if you can see, you can be seen. So their evidence is that he couldn't see them. So how could they really contradict that that they've already put in? I know it's a problem. It's not your fault, but we have to take these cases for as they're planned, and that's what your client put in. Your Honor, there's nothing more I can say about the face of the criminal complaint and whether it establishes or not or what the photographs mean there, and we have in our brief an argument about the scope of Alvarez. Well, let me address the tax assessor point real quickly. It's asserted that this is changing facts, that this is as if I've come into this appeal and changed facts, and that's not the case. The Cubbies said in their oppositions to the motion to dismiss, this is docket entry 41 at page two, where they contest that the marijuana was in plain view to the assessor. They say, additionally, when the agent entered curtilage at the rear walkout basement patio area, he further violated plaintiff's reasonable expectation of privacy and then proceeded to compound the situation by snooping in the closed containers on plaintiff's rear walkout patio area, and again, in opposition to the Manches motion to dismiss, DE 48 at 11, where they say that he illegally searched plaintiff's walkout basement patio personal effects, and then again, in objecting to the magistrate judge's report. I don't know what else pro se folks could have done. Now, no one's contested the marijuana was seen in the patio area. The briefs filed below by the defendants, including Mr. Buck's brief, said that the tax assessor observed what he thought to be marijuana in the patio area, and so we have a question wholly aside from the opening of a front door, which we maintain is, regardless of what was seen when he did that, highly problematic, in the Wigrin case on which they relied from the Sixth Circuit, just to close, if I can, Your Honor, in the Wigrin case, which was a summary judgment case, in which the court said it was an unsettling intrusion, the court said tax assessors would be well advised to obtain consent or warrant as a matter of course before breaching the curtail, which because in many instances, such an intrusion may be a Fourth Amendment search, and this is that case, Your Honor. So we urge the court to reverse the Rule 12b-6 dismissal. Thank you very much. Thank you so much. Mr. Andrew Sear, we note that you are a court opponent, and we want to thank you, especially because of your work and your assistance to the court in taking these cases, and we really appreciate that. And of course, we acknowledge the work of all counsel in this case. We're gonna come down, great counsel, and first ask our esteemed court deputy to dismiss us for the day. This honorable court stands adjourned until tomorrow morning at 9.30. God save the United States and this honorable court.
judges: Roger L. Gregory, Henry F. Floyd, Stephanie D. Thacker